UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STELLA DULANEY et al.,                                                             Plaintiffs,

v.                                                           Civil Action No. 3:17-cv-482-DJH-RSE

FLEX FILMS (USA), INC. et al.,                                                     Defendants.

*  *  *  *  *

## MEMORANDUM OPINION AND ORDER

Plaintiffs Stella Dulaney, David Fowler, and Andrea Harshfield allege discrimination and wrongful termination of their employment with Defendant Flex Films (USA), Inc. in violation of the Kentucky Civil Rights Act.  (Docket No. 31, PageID # 1448)  All three plaintiffs alleged in the complaint that they were "treated differently, harassed, and terminated because of their race and national origin as Americans" and fired in retaliation for reporting discrimination.  (D.N. 1-1, PageID # 13)  Dulaney and Harshfield also claimed that they were discriminated against because they are female.  (*Id.*)  Defendants now move for summary judgment as to all of Dulaney and Fowler's claims.[1]  (*See* D.N. 22; D.N. 23)  Following careful consideration, including extensive review of the record and consideration of oral argument, the Court will grant Defendants' motions for summary judgment.

## I.

Flex Films—which manufactures flexible polyester packaging films—is the American subsidiary of UFLEX, a multinational corporation based in India.  (D.N. 31, PageID # 1448)  The headquarters and primary manufacturing and distribution facility of Flex Films are located in

---

[1] Plaintiff Andrea Harshfield's claims were dismissed with prejudice after Harshfield and the defendants reached a resolution.  (D.N. 41; D.N. 43)

Elizabethtown, Kentucky.  (D.N. 22-1, PageID # 64)  The Elizabethtown location was the first and only UFLEX manufacturing facility in the United States.  (D.N. 31, PageID # 1450)

Plaintiffs allege that employees of American origin were discriminated against at Flex Films.  (D.N. 1-1, PageID # 13)  Plaintiffs maintain that although Flex initially hired Americans to fill its demand for workers, "employees of American . . . origin[] were treated differently and discriminated against by their Indian managers."  (D.N. 31, PageID # 1451)  When asked whether Indian employees on visas took jobs formerly occupied by American nationals, Steve Sargeant, General Manager of Research and Development, testified that "some of the PLC operators took jobs that used to—there used to be a lot of Americans there."  (D.N. 31-1, PageID # 1485)  He also testified that the supervisor for the "slitting area" at the plant used to be American, but that he was terminated and replaced with a person of Indian origin.  (*Id.*)

Sargeant also testified that many people at Flex Films, including individuals in management and on the "shop floor," made comments that "American people don't work very hard" and that Americans "are stupid, or they don't listen."  (*Id.*, PageID # 1491)  Fowler testified that he heard Anantshree "Audi" Chaturvedi—the Vice Chairman of Flex Films—tell employees that if they could not "get this plant in line, we will fire everybody and replace them with Indians." (D.N. 22-4, PageID # 208)  While Sargeant recalled being part of a meeting where Chaturvedi said "something like that," he could not recall if Chaturvedi said "with Indians."  (D.N. 31-1, PageID # 1485)  According to Sargeant, Indian employees at Flex Films received preferential treatment over their American counterparts in several ways, including vacation time and subsidized healthcare.  (*Id.*, PageID # 1484, 1489)  Sargeant testified that John Phillips, the Human Resources Manager, told him that Vijay Yadav, the Business Head of Flex Films, had a hidden agenda, that Americans were being punished at the company, and that there was a different system

2

for American employees.  (*Id.*, PageID # 1453)  Sargeant said that Phillips also told him that Yadav had plans to remove five American employees: Stella Dulaney, David Fowler, Andrea Harshfield, and Joe Hearne.  (*Id.*, PageID # 1482-83)

In addition to discrimination based on national origin, the plaintiffs also allege that female employees were discriminated against at Flex Films.  (D.N. 1-1, PageID # 13)  Dulaney testified that she was told that there were no women in management positions at UFLEX globally prior to the opening of the Elizabethtown location, and that the company only had five females in management.  (D.N. 23-3, PageID # 1281)  In addition to Dulaney and Harshfield, Sargeant testified that three other women complained to him about harassment at Flex Films.  (D.N. 31-1, PageID # 1486-90)  Although Sargeant does not believe that he specifically reported anything to do with sex, race, or national origin discrimination, he testified that he frequently spoke with Phillips about these issues and wanting to improve the culture at Flex Films.  (*Id.*, PageID # 1492)

In response, Defendants argue that Dulaney cannot establish a prima facie case of discrimination; has no evidence that Flex Films' proffered reason for her termination was pretextual; and cannot establish a prima facie case of retaliation.  (D.N. 23-1, PageID # 303, 319)  Defendants likewise argue that Fowler is unable to establish a prima facie case of discrimination or prevail on his retaliation claim.  (D.N. 36, PageID # 1652-55)  And further, Defendants assert that (1) Fowler has no evidence to support his assertion that Yadav had a plan to replace American employees with Indian individuals (*id.*, PageID # 1645); (2) Fowler has not offered any evidence beyond hearsay statements to show that Flex Films' proffered reason for his termination was pretextual (*id.*, PageID # 1654); and (3) Fowler and Dulaney cannot succeed on their hostile work environment claims (*id.*, PageID # 1646, 1648; D.N. 37, PageID # 1659).

A.     **David Fowler**

1.     **Pricing Changes**

Chaturvedi hired Fowler for the position of Chief Marketing Officer in approximately January 2016 and was Fowler's supervisor during Fowler's tenure at Flex Films.  (D.N. 22-1, PageID # 65)  Despite the title, Fowler's job consisted of managing sales accounts and a team of four salespersons.  (*Id.*, PageID # 63; D.N. 22-4, PageID # 127)  On May 27, 2016, Chaturvedi sent an email including two attachments to Fowler and other members of management, the second of which stated that pricing matters needed to be dealt with "internally between Business Head and Marketing Heads" and that major deviations in pricing changes were to be approved by the Vice Chairman (D.N. 22-4, PageID # 234, 241).  Fowler made pricing changes on two occasions, however, increasing the rebates and reducing pricing for certain film products sold to two clients—Coveris and Bemis.  (D.N. 22-1, PageID # 66)  Fowler testified that he was unaware of the directive regarding pricing changes and that he did not recall seeing the attachments sent by Chaturvedi, though he was copied on the email and replied to it.  (D.N. 22-4, PageID # 124-25)

In August 2016, Wayne Morris—the Chief Financial Officer of Flex Films—sent an email to Fowler regarding two increases in rebates that occurred beginning April 1, 2016, and June 9, 2016.  (*Id.*, PageID # 246)  For the June 9 rebates, Fowler stated that the increase in rebates for the third quarter of 2016 was something he "worked out" with Coveris over the course of the prior week in June.  (*Id.*, PageID # 140-41)  Based on his recollection, Fowler believed he had approval from Chaturvedi for this rebate and that he had discussed this increase with Yadav.  (*Id.*)  Although Morris emailed Fowler asking who had approved this increase (*id.*, PageID # 246), Fowler testified that he was sure he and Morris had discussed the increase in rebates previously (*id.*, PageID # 143).

On November 23, 2016, Yadav sent an email to Fowler stating that a "major anomaly" was discovered upon review of the Coveris rebate sheet, and that the increase in rebates was "NOT approved by [Chaturvedi] or [him]self." (*Id.*, PageID # 253) On December 24, 2016, Yadav sent an email to Chaturvedi, saying that despite Fowler's assertions to the contrary, the company was "analyzing and finding several unapproved price reductions by [Fowler and] his team or in [Fowler's] accounts" and asked whether this was a "[d]isturbing pattern." (*Id.*, PageID # 252) The email ended with a projected total revenue loss of $223,000 attributed to Fowler's price reductions from May 2016 to November 2016. (*Id.*)

On January 3, 2017, Yadav emailed Chaturvedi saying that Fowler had offered price reductions to another client, Bemis, "with NO consent from myself (or you)." (*Id.*, PageID # 262) Yadav told Chaturvedi that this was "becoming a pattern with [Fowler] and his team" as it already "happened/[is] happening with Coveris." (*Id.*) The next day, Morris emailed Fowler, Chaturvedi, and Yadav, saying that Fowler's submitted rebate calculation "included an increase even though Finance was told no changes would be made," and that Finance was waiting for Fowler to show that the increase was approved by Chaturvedi or Yadav. (*Id.*, PageID # 260) On January 9, 2017, Chaturvedi emailed Fowler, saying that there was "a price reduction to these rebates that you are denying and no one seems to have approved." (*Id.*, PageID # 286) Chaturvedi then removed Fowler from the Bemis and Coveris accounts and reassigned them to another team. (*Id.*, PageID # 172-73) Notably, Fowler has never contended that his removal from these accounts was influenced by his race or nationality. (D.N. 22-4, PageID # 175)

## 2.    Sales-Team Performance

The members of Fowler's sales team were assigned monthly sales goals. (*Id.*, PageID # 127) The team's performance relative to their assigned sales goals was tracked by

management, and Fowler received monthly feedback regarding his performance and the performance of the members of his team. (*Id.*, PageID # 128-29) Fowler testified that he did not have individual sales goals per month and was not responsible for making any sales on his own because he was not assigned any accounts. (*Id.*, PageID # 128, 185-86) Fowler admitted, however, that he had the authority to assign himself accounts, and that he was assigned monthly sales goals that he failed to meet. (*Id.*, PageID # 185-87)

On March 2, 2017, Chaturvedi sent an email to Fowler telling him that his failure to improve his team's numbers was a "troubling trend" and that Fowler needed to "push [his] team further as discussed." (*Id.*, PageID # 277) On March 20, 2017, Deepak Chopra, the Manager of Sales and Marketing, sent an email to Fowler regarding his team's performance as of that date, with the reminder that Fowler "[n]eed[ed] a good push to reach the targets." (*Id.*, PageID # 279) Chaturvedi sent an email to Fowler on the same day, saying "Dave, we can't really be planning to close the month on less than 50 percent of the product target . . . Please push and let's get close to the target this month." (*Id.*, PageID # 278) Fowler testified that when Chaturvedi sent this email, only seventy-five percent of the month had transpired and that the majority of shipping occurs the last week of the month. (*Id.*, PageID # 193-94) However, Fowler admitted in his deposition testimony that the sales performance of some members of his team was unsatisfactory. (D.N. 22-4, PageID # 195-96)

Chaturvedi testified that he saw "very little communication between [Fowler] and his team[,] and that [Fowler] wasn't really managing them because when issues would come up, he would not take ownership of the situation, but instead point to his team and put the salesperson under scrutiny." (D.N. 22-5, PageID # 287) Defendants maintain that Fowler's "sales and the sales of his team consistently failed to come close to amended expectations, and [that] Fowler

admitted his sales performance and those of his team were unsatisfactory." (D.N. 22-1, PageID # 63)

### 3.     Termination

Chaturvedi terminated Fowler's employment effective April 5, 2017. (D.N. 22-1, PageID # 68) Defendants claim that the decision was based on Fowler's unauthorized pricing changes, as well as his "unsatisfactory management of sales volume generated by accounts assigned to [him] and the group of sales representatives assigned to [him] during the course of his employment." (*Id.*) Chaturvedi also said that "upon multiple inquiries, both by email and phone conversations, . . . Fowler simply ignored [Chaturvedi's] requests of clarification and continued to extend pricing that led Flex into further profit deterioration with two key accounts." (D.N. 22-5, PageID # 293) He also noted that "Fowler ran losses in the millions of dollars through just blatant . . . disregard of the protocol that he was supposed to follow, and that led [Chaturvedi] to believe that [Fowler] [was] not really paying attention to the details that he need[ed] to and is . . . definitely not the right person for the job." (*Id.*) On the same date, Chaturvedi also terminated Tanvir Singh, an Indian employee with H-1B visa status, per Fowler's recommendation. (D.N. 22-1, PageID # 68; D.N. 22-4, PageID # 197) Fowler maintains that his team's sales were only down "for the snapshot of th[o]se two months" and that it was because his team was provided higher prices for their clients than those given to other teams. (*Id.*, PageID # 198, 200)

### B.     Stella Dulaney

### 1.     Hiring

Dulaney began her employment as Field Service Manager on February 2, 2016. (D.N. 23-1, PageID # 304) As Field Service Manager, Dulaney was the lead supervisor over the Research and Development Department. (*Id.*) Dulaney did not possess any degree beyond high school

when she was hired, though she later completed one-and-a-half years at a local community college. (*Id.*)  Sargeant—Dulaney's supervisor until January 2017—hired Dulaney knowing that she did not possess a college degree.  (*Id.*, PageID # 304, 306-07)  Sargeant explained that he hired Dulaney because "it [was] not possible to hire people with all the skills you want" in Elizabethtown and so he had "switched to the mode of hiring people with relevant experience that were intelligent and [that he] could train." (D.N. 31-1, PageID # 1486)  Accordingly, Sargeant informed Dulaney that she would be in a two-year training program when she first began working at Flex Films, which included going back to school for more education.  (*Id.*)  Sargeant said he believed that it was common for Flex Films to hire individuals based on their work history even if they did not have the specific educational requirement desired for the position.  (*Id.*)

### 2.    Restructuring

On June 1, 2016, Sargeant sent his assessment of the qualifications of the Research and Development staff to management.  (D.N. 23-1, PageID # 306; D.N. 23-3, PageID # 1372-74)  The assessment showed that for Dulaney's position of Field Service Manager, six to ten years of experience and a Bachelor's or Master's of Science "or equivalent with program" was required. (D.N. 23-3, PageID # 1373)  On June 24, 2016, Sargeant sent an email to Yadav, Chaturvedi, and individuals in human resources regarding his plans to reorganize the Research and Development Department.  (*Id.*, PageID # 1375)  Sargeant reported that to effectively grow the department, several changes were needed, including

> 1-[T]he six functional areas [Sargeant is] accountable for[] need to be split into two buckets so [he] can focus more on R&D.
>
> 2-The Four functional areas that are plant/customer related will report to a new key resources "Technical Director[.]"  After all the internal sign-offs, [the company] need[s] to begin recruiting for a Technical Director.  No local resource has the capability, experience or education to handle [the position], thus an outside resource is needed . . . .

8

> In order to make this process as fast as possible we should focus on the Technical Director role first and to the u[t]most urgency.  Please assist me in developing the internal job descriptions and getting the sign-offs so we can move on this.

(*Id.*)  As part of this restructuring, the company hired Deepak Mehta, a U.S. citizen of Indian descent, as the Technical Director beginning January 3, 2017.  (D.N. 23-1, PageID # 306-07)  He reported directly to Yadav.  (*Id.*)

Within a few days of Mehta's hiring, the Research and Development Department was divided according to Sargeant's plan, with Sargeant responsible for research while Mehta was responsible for "operation/administration" under a new department called the Technical Services Department.  (D.N. 23-3, PageID # 1433)  This department replaced the former Field Service Department, and the Field Service Manager position was moved to Mehta's new department.  (*Id.*)  Thereafter, Dulaney reported to Mehta instead of Sargeant.  (*Id.*)

After Dulaney learned of Mehta's hiring, but before Mehta began working at the company, Sargeant encouraged Dulaney to keep working on the two-year program and learning as much as she could from Mehta, to "possibly take over [Mehta's] job when he retired."  (D.N. 23-3, PageID # 1164)  According to Defendants, however, "plans were made to eliminate the Field Service Manager position" at the same time Mehta was hired in early January 2017.  (D.N. 23-1, PageID # 307)  The position would be replaced by a new, higher-level position called "Application Engineer," which required specific levels of technical and scientific education and experience such as a "BA/BS in Chemical, Polymer, Plastics Engineering."  (*Id.*; D.N. 23-7, PageID # 763)

### 3.    Termination

Pursuant to Sargeant's reorganization plan, Dulaney's position was eliminated and she was subsequently terminated on February 7, 2017.  (D.N. 23-1, PageID # 304)  Chaturvedi said that Dulaney's position was eliminated "because it was not providing the value that it needed to

provide." (D.N. 23-8, PageID # 771)  Yadav said that her position was eliminated because the company was "looking for a more skilled, higher educated, and more experienced person in that role."  (D.N. 23-6, PageID # 704)  Further, Defendants stated that—in addition to the reorganization of the department—Dulaney was terminated because "despite management's efforts to train and educate Dulaney . . . her performance demonstrated a lack of technical education, technical understanding, and technical/scientific proficiency."  (D.N. 23-4, PageID # 660)  Sargeant disagreed with this assessment, however, and said that he "absolutely" considered Dulaney to be trainable, and that he was "happy to have the ability to hire her." (D.N. 31-1, PageID # 1487)  As to the purported issues with her work product, Dulaney maintains that Yadav was "nitpicking" and criticizing her work due to her sex, race, and national origin. (D.N. 23-3, PageID # 1223-24)

### 4.      Complaints to HR and Management

On January 31, 2017, Yadav sent an email to Dulaney and five other Flex Films employees regarding the resolution of a client matter.  (D.N. 23-7, PageID # 758-59)  In the email, Yadav took issue with the praise Dulaney had received for her work on the matter because he believed the problem had resolved itself with "no 'great detailed work'" from Dulaney.  (*Id.*, PageID # 759) Dulaney forwarded Yadav's email to Peggy Salmon, a Human Resources Generalist.  In her email to Salmon, Dulaney said:

> The below email response [from Yadav] was uncalled for and is another example of [Yadav] trying to humiliate me in front of fellow employees.  His remarks are offensive and unfair as his only investigation was on that email chain.  He did not come to me and ask me for the full history of this, as I would have been more than happy to share other emails, voicemails, and notes from telephone calls that took place between myself, Joe Hearne, [Harshfield], and [the client].

(*Id.*, PageID # 762)  Dulaney met with Salmon to discuss "how [she] felt that Yadav was treating her differently," though she did not recall whether sex, race, or national origin was specifically

mentioned.  (D.N. 23-7, PageID #  715)  According to Dulaney, Salmon advised her to speak with Chaturvedi.  (*Id.*, PageID # 715-16)  Dulaney testified that she met with Chaturvedi on February 2, 2017 and told him that employees were "walking on eggshells around the office" and were "afraid that they were going to be fired at any moment."  (*Id.*, PageID # 717)  She believes that she brought up the way Yadav treated employees as well and brought copies of emails to discuss, though Dulaney could not recall whether she mentioned race, sex, or national origin during this meeting. (*Id.*, PageID # 717, 719)  Dulaney also testified that she informed Chaturvedi about her numerous conversations with Sargeant, and that Sargeant had told her to speak with Salmon and Phillips in human resources.  (*Id.*, PageID # 718)  On February 3, 2017, Dulaney also sent an email regarding Yadav to her supervisor, Mehta.  (*Id.*, PageID # 769)  She asked if Mehta had the chance to speak with Yadav about her job title and duties, noting that her "responsibilities and background [did] not include the technical depth that Yadav required" on a report from December 2016.  (*Id.*)

Defendants maintain that Dulaney did not report or complain about race, national origin, or sex discrimination to Phillips, Salmon, or Chaturvedi.  (D.N. 23-1, PageID # 310)   Dulaney states that she met with Sargeant numerous times about Yadav "picking on" her.   (D.N. 23-3, PageID # 1260)  Dulaney agreed that Yadav's edits to her work were legitimate but stated that Yadav made these criticisms because of her race, nationality, or gender, and that Yadav was "nitpicking the reports because [she] was female . . . [a]nd American."  (*Id.*, PageID # 1224-25) According to Dulaney, she told Sargeant that she felt as though Yadav was picking on her, and that "nothing was ever good enough."  (*Id.*, PageID # 1263)  She also said that Sargeant agreed that she was being treated differently because she was non-Indian and female.   (*Id.*, PageID # 1282) Dulaney testified that  "[n]othing that [she] ever did was going to be good enough because [she]

was a female American" and that she "felt like [Yadav] did not ask [the same] questions of other people who turned in reports." (*Id.*, PageID # 1338-39)

Sargeant testified that he passed Dulaney's complaints up to the CEO, who left the company in the middle of 2016.  (D.N. 31-1, PageID # 1483)  Sargeant also talked to Chaturvedi "a couple [of] times about how [Yadav] was too abrasive and needed to control the way he communicated." (*Id.*)  Sargeant said that he remembered Dulaney making complaints about being treated negatively because she was a female, and that they discussed issues she had with Yadav on the basis of her sex, gender, or national origin.  (*Id.*, PageID # 1481-82)  Sargeant believed that Dulaney was doing very well before Yadav started, but that afterwards "her situation got worse." (*Id.*, PageID # 1481)  According to Sargeant, standards for Dulaney were much higher than they were for other employees, and Yadav held Dulaney to a higher standard than others at the plant.  (*Id.*, PageID # 1482)  Sargeant testified that "[Yadav] was really on [Dulaney's] case" about a certain product issue and that Yadav "[j]ust didn't want her to have resources [or] to work with her." (*Id.*) Sargeant said that Yadav would criticize most of Dulaney's documents and would not provide Dulaney resources to assist with her work.  (*Id.*)  Sargeant believes that he told Phillips that Dulaney had concerns that Flex Films was a hostile work environment in general, that "[w]hen she would come to work, it was very uncomfortable for her," and that "[s]he felt like she could never do a good enough job." (*Id.*, PageID # 1491)  Sargeant said that he never had any problems with Dulaney or her work, and that she was an "outstanding performer." (*Id.*)

Dulaney also spoke with Phillips in December 2016, though she could not recall if she specifically brought up sex, race, or nationality.  (*Id.*, PageID # 1332)  Phillips was then terminated in January 2017.  (D.N. 31, PageID # 1456)  Dulaney reached out to Phillips via Facebook Messenger following his termination, and Phillips told Dulaney that Yadav "was very

uncomfortable with [Phillips's] level of push back and challenging relative to employee safety concerns and the behavior of Indian leaders." (D.N. 23-3, PageID # 1435)  Phillips also wrote that he felt "bad for the Americans that remain[ed]" and that Yadav's "agenda [was] absolutely about protecting Indians right or wrong and once [Chaturvedi] turns a blind eye, Americans will get tortured and pushed out in a big way." (*Id.*, PageID # 1437)  Finally, Phillips wrote that "[t]he environment at Flex will be volatile and borderline hostile in 2017" and that Yadav would also terminate Sargeant and Fowler if he could. (*Id.*, PageID # 1437-38)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1).  For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  However, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3).  To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").  When the evidence presents a sufficient disagreement, it is proper to permit the case

13

to proceed to a jury.  *See Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251-52).

## A.    KCRA

Dulaney and Fowler allege that they were terminated due to unlawful discrimination in violation of the KCRA.  (D.N. 1-1, PageID # 11-14)  Under the KCRA, it is unlawful for an employer **"**[t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, [or] sex."  Ky. Rev. Stat. § 344.040(1)(a).  The KCRA "is modeled after, and is virtually identical to, Title VII" and "Kentucky courts have, therefore, followed federal law in interpreting its anti-discrimination statute."  *Mills v. Gibson Greetings, Inc.*, 872 F. Supp. 366, 371 (E.D. Ky. 1994).  Consequently, the Court will analyze the alleged discrimination under the framework provided by Title VII. *Schlenk v. Goodwill Indus. of Ky.*, No. 3:16CV-601-JHM, 2019 U.S. Dist. LEXIS 57441, at *10 (W.D. Ky. April 4, 2018).

### 1.    Hearsay

As a preliminary matter, Defendants argue that Plaintiffs have no evidence to support their assertion that Yadav "had a plan to rid the workplace of American employees and replace them with Indian individuals" beyond the "unsupported and speculative testimony" of Sargeant and "hearsay in the form of a . . . message sent" by Phillips shortly after his termination.  (D.N. 36, PageID # 1645-46)  "Hearsay evidence may not be considered on [a motion for] summary judgment."  *Wilson v. Dana Corp.*, 210 F. Supp. 2d 867, 872 (W.D. Ky. 2002) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999)).  Thus, as "[h]earsay . . . will not be considered," *id.*, the Court must first determine whether the following

14

items constitute inadmissible hearsay: (1) Sargeant's testimony that Phillips told him that Yadav had a hidden agenda and that Yadav had plans to remove five American employees; and (2) a Facebook message from Phillips to Dulaney after he was terminated.

The Court finds that these statements constitute hearsay.  Federal Rule of Evidence 801(c) defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c)(1) & (2).  It is undisputed that neither of Phillips's statements were made under oath or while testifying in court.  Further, both appear to be offered for the truth of the matter asserted as the plaintiffs relied upon these statements in their briefing to rebut the defendants' proffered reason for their termination.  *See EEOC v. Tepro*, 133 F. Supp. 3d 1034, 1059 (E.D. Tenn. 2015) (finding that the plaintiff offered statements as proof of the truth of the matter asserted when it relied upon the statements to prove that the defendant "intentionally targeted older employees for reclassification and layoffs because of an age-based bias").  (*See* D.N. 31, PageID # 1453, 1457, 1463, 1470)  Moreover, the Court notes that the plaintiffs did not dispute—either in their briefs or in oral argument—that these items constitute hearsay.  (*See* D.N. 31; D.N. 44)  In fact, the plaintiffs made no argument whatsoever regarding the hearsay issue in their response to the defendants' motions for summary judgment.  (*See* D.N. 31)

At oral argument, Plaintiffs' counsel likewise made no argument as to what hearsay exceptions—if any—applied to the statements in Sargeant's deposition testimony, and thus "the Court will not take . . . [those] statements for their truth."  *Auble v. Babcock & Wilcox Tech. Servs. Y-12, LLC*, No. 3:13-CV-422-TAV-HBG, 2015 U.S. Dist. LEXIS 140868, at *17 (E.D. Tenn. Oct. 15, 2015) ("Because defendant made no argument to qualify any of the co-worker complaints as within a hearsay exception, the Court will not take any of these statements for their truth.").  As to

the Facebook message, Plaintiffs' counsel simply stated during oral arguments that Phillips "was not cooperative, but he was not unavailable." (D.N. 44, PageID # 1708) Counsel then attempted to compare Phillips's Facebook message to a police report, stating that "if a police officer comes in here and testifies differently than [what is contained in the police report], he can be impeached with what his report is, even if the report itself is maybe inadmissible on a prior statement." (*Id.*) But police reports are a matter of public record—which is its own hearsay exception—and regardless, "[a]ny such reliance on the public records exception becomes more questionable . . . to the extent that the police reports incorporate the statements of non-party witnesses at the scene of the officers' encounter." *Brady v. City of Westland*, 1 F. Supp. 3d 729, 732 n.3 (E.D. Mich. 2014). Therefore, comparing the message to a police report is unpersuasive.

Further, even if the Court were to agree that the Facebook message could be used for impeachment purposes, that has no bearing on the present motion. Because a prior inconsistent statement is excluded from the definition of hearsay—since it is offered for impeachment purposes and not for the truth of the matter asserted—the Court still could not consider the statements contained in Phillips's Facebook message for their truth. *See* Fed. R. Evid. 801(c), 801(d)(1)(B) (listing evidence excluded from the definition of hearsay). Accordingly, in ruling on the motions for summary judgment, the Court will not consider Sargeant's testimony regarding statements made by Phillips about Yadav's "agenda" and plan to remove American employees, or Phillips's Facebook messages to Dulaney. *See Wilson*, 210 F. Supp. 2d at 872.

### 2.     New Claim

In response to Defendants' motions for summary judgment, the plaintiffs attempt to characterize their KCRA claims as hostile work environment claims. (D.N. 31, PageID # 1459) In reply, Defendants contend that the plaintiffs cannot oppose summary judgment using a hostile-

work-environment theory because no such assertion was made in their complaint.  (D.N. 36, PageID # 1646)  During oral argument, Plaintiffs' counsel maintained that "the complaint sets forth sufficient evidence of both discrete acts and [a] hostile work environment."  (D.N. 44, PageID # 1702)  Counsel went on to say that a hostile work environment was "not only an allegation in the complaint, but it's also confirmed, as we've reference[d] in our response, by the testimony of Dr. Steve Sargeant."  (*Id.*, PageID # 1703)

But the plaintiffs' argument that their complaint sufficiently sets forth a hostile-work-environment claim is inaccurate.  With regard to their discrimination claim under the KCRA, plaintiffs alleged in their complaint that they "were discriminated against in their employment on the basis of" protected characteristics, and that "Defendants took unlawful adverse employment actions against Plaintiffs based on their national origin by terminating their employment and replacing them with H1-B visa Indian nationals."  (D.N. 1-1, PageID # 13)  Nowhere does the complaint allege a hostile work environment.  Thus, the plaintiffs are asking the Court at the summary judgment stage to construe a claim in the complaint that does not exist.  This the Court cannot do.  *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787-88 (6th Cir. 2005) (rejecting plaintiff's argument that she was entitled to liberal construction of her complaint to include a new theory raised for the first time at the summary-judgment stage because '[o]nce a case has progressed to the summary judgment stage . . . the liberal pleading standards under . . . [the Federal Rules] are inapplicable" (internal quotation marks omitted)).

Moreover, as described above, Plaintiff's complaint only sets forth discrete acts which—contrary to the position of Plaintiffs' counsel—cannot contribute towards a hostile work environment claim.  *See Krause v. LexisNexis*, No. 06-12256, 2007 U.S. Dist. LEXIS 4571, at *18-*19 (E.D. Mich. Jan. 23, 2007) (explaining that the Sixth Circuit has held that discrete acts could

17

not be used as part of a hostile-work-environment claim (citing *Sasse v. United States DOL*, 409 F.3d 773, 783 (6th Cir. 2005)).  Discrete acts are "acts such as termination, failure to promote, denial of transfer, or refusal to hire." *AMTRAK v. Morgan*, 536 U.S. 101, 114 (2002).  By contrast, the non-discrete acts which make up hostile environment claims "are different in kind from discrete acts.  Their very nature involves repeated conduct." *Id.* at 115.  "The actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 637 (2007).  Thus, the allegations of discrete discriminatory acts in the complaint are insufficient to plead a hostile work environment claim.

As the plaintiffs' complaint did not contain any factual allegations to support a claim of hostile work environment, the proper procedure to assert a new claim was to amend the complaint in accordance with Rule 15(a) before asserting the new claims in their summary-judgment briefing. *See Communs. Unlimited Contr. Servs. v. Comdata, Inc.*, No. 3:17-cv-01158, 2020 U.S. Dist. LEXIS 21429, at *26-*27 (M.D. Tenn. Feb. 7, 2020) (citing *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2723 (3d ed. Supp. 2005); *Tucker*, 407 F.3d at 788)).

Accordingly, Plaintiffs' arguments concerning an alleged hostile work environment "have not been and will not be considered by the Court." *Id.* at *27; *see also Hall v. Rag-O*, No. 18-12-DLB-CJS, 2020 U.S. Dist. LEXIS 78882, at *32 n.16 (E.D. Ky. May 5, 2020) ("A new claim cannot be raised . . . in response to a summary-judgment motion." (citing *Tucker*, 407 F.3d at 788)); *Oster v. Huntington Bancshares Inc.*, No. 2:15-cv-2746, No. 2017 U.S. Dist. LEXIS 76651, at *64-*65 (S.D. Ohio May 19, 2017) (finding that gender discrimination and hostile work environment constitute separate legal claims, with different elements, and that as the plaintiff did not add a hostile-work-environment claim to her complaint, or seek leave to amend her complaint,

"the Court cannot allow a new cause of action to proceed" (citations omitted)); *Kurtz v. Sec'y of the Army*, No. 3:06-1209, 2009 U.S. Dist. LEXIS 119683, at *11-*12 (M.D. Tenn. Dec. 21, 2009) (finding that the proper procedure was for plaintiff to add the new claims to her complaint or amended complaint, and that "it is well-settled that new claims may not be brought in response to summary judgment" (internal citations omitted)).  Instead, the Court will only consider whether the plaintiffs' properly pled discrete discriminatory action claims may proceed to trial.  *Oster*, 2017 U.S. Dist. LEXIS 76651, at *65.

### 3.   Discrete Discriminatory Action

Although the plaintiffs asserted claims under a discrete-discriminatory-action theory in their complaint (D.N. 1-1, PageID # 8-13), they made no such argument in their response to the defendants' motions for summary judgment (*see* D.N. 31).  Instead, the plaintiffs only set forth arguments regarding their new hostile-work-environment theory, which the Court has dismissed for the reasons explained above.  Similarly, during oral arguments, Plaintiffs' counsel failed to substantively address the discrete-discriminatory-action claims or to provide any explanation for why the plaintiffs' briefing did not address this issue.  (*See* D.N. 44)  But ignoring an argument at the summary-judgment stage can prove fatal to a disputed claim.

"[The Sixth Circuit]'s jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Larimer v. Grant*, No. 3:03CV664-S, 2006 U.S. Dist. LEXIS 49743, at *4, n.3 (W.D. Ky. July 17, 2016) (declaring claim abandoned where the plaintiff failed to address the claim in response to defendant's motion for summary judgment but addressed other claims).  Thus, given the plaintiffs' failure to address or provide any support for their race, gender, or national-origin

claims in their summary judgment briefing or during the evidentiary hearing on the motions, the Court concludes that the plaintiffs have abandoned these claims.  *See Bauer v. Cty. of Saginaw*, 111 F. Supp. 3d 767, 782 (E.D. Mich. 2015) (citing *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006)).

### 4.    Retaliation

#### a.    Prima Facie Case

Dulaney contends that Chaturvedi terminated her "in retaliation for complaints she made concerning disparate treatment and harassment between Indian nationals and non-Indian employees, as well as disparate treatment and harassment between males and females in the workplace."  (D.N. 31, PageID # 1450)[2]  The KCRA provides that it is an unlawful practice for a person or two or more persons to conspire "[t]o retaliate or discriminate in any manner against a person because [s]he has opposed a practice declared unlawful by this chapter, or because [s]he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter."  Ky. Rev. Stat. § 344.280(1).  Retaliation claims under the KCRA are evaluated using the same standards as applied to federal Title VII claims.  *Stanley v. Insights Training Grp., LLC*, No. 3:09-cv-231, 2013 U.S. Dist. LEXIS 1428, at *18 (W.D. Ky. Jan. 4, 2013) (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)).  Dulaney has provided no direct evidence of retaliation.

---

[2] In their motion for summary judgment, Defendants argue that "[a]lthough Fowler has a claim of retaliation under the KCRA, he admitted in his deposition that he never complained about discrimination to anyone."  (D.N. 22-1, PageID # 69)  Plaintiffs' response addressed only Dulaney's retaliation claim (D.N. 31, PageID # 1464-70), and Plaintiffs' counsel conceded during oral argument that they had not addressed Fowler's retaliation claim due to an unlikelihood of success on the merits of that claim (D.N. 44, PageID # 1711-12).  Accordingly, to the extent that Fowler makes any claims of retaliation, summary judgment is warranted.

In assessing claims of retaliation based on circumstantial evidence, courts apply the burden-shifting analysis of *McDonnell Douglas*.[3]  *Id.*  Under that framework, the plaintiff must establish a prima facie case of retaliation by showing that "(1) [s]he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action."  *Hamilton*, 556 F.3d at 435 (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).  The parties do not dispute that Defendants took an adverse employment action against Dulaney when they eliminated her position and terminated her employment.  Therefore, the Court need only determine whether Dulaney engaged in a protected activity; whether Defendants knew of Dulaney's protected activity; and whether there was a causal connection.  *Hamilton*, 556 F.3d at 435.  Because Dulaney has not any presented evidence showing that the decisionmakers knew of her protected activity, the Court finds that she has failed to establish a prima facie case of retaliation.  *See Wimpye v. AK Steel*, No. 1:11-cv-844, 2013 U.S. Dist. LEXIS 86187, at *20 (S.D. Ohio June 18, 2013) (granting defendant's summary judgment motion because the plaintiff "failed to establish the 'prior knowledge' element of his prima facie case for retaliation").

---

[3] Although the Court will grant summary judgment as to Dulaney's underlying discrimination claims, a "[p]laintiff's success on her retaliation claim does not depend on the merits of the underlying discrimination claim." *Carpenter v. Kaiser Permanente*, No. 1:04 cv 1689, 2006 U.S. Dist. LEXIS 69564, at *48 (N.D. Ohio Sept. 27, 2006) (quoting *Burns v. Jacor Broadcasting Corp.*, 128 F. Supp. 2d 497, 514 (S.D. Ohio 2001)).  "Thus, the employee need not establish that the alleged conduct she opposed was in fact discriminatory, so long as she can demonstrate that she had a good faith, reasonable belief that the conduct about which she complained was in violation of Title VII." *Id.* (quoting *Burns*, 128 F. Supp. 2d at 514).  Defendants do not dispute that Dulaney had the requisite good-faith belief when she brought the present suit.  (*See* D.N. 22; D.N. 23; D.N. 36; D.N. 37)

i.        **Knowledge of the Protected Activity**

In order to satisfy the knowledge prong of her prima facie case, Dulaney must produce evidence showing that the individuals who took the adverse employment action knew of her protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002).  In making this determination, the Court considers the knowledge and motive of those who were meaningfully involved in or influenced the decision to terminate. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) ("[C]ourts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee.").

 "An employee may survive summary judgment by producing either direct or circumstantial evidence to establish th[e] [knowledge] element of her claim." *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 909 (W.D. Ky. 2015) (citing *Proffitt v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*, 150 F. App'x 439, 442-43 (6th Cir. 2005)).  "Where the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than 'offer[] only conspiratorial theories . . . or flights of fancy, speculations, hunches, intuitions, or rumors." *Proffitt*, 150 F. App'x at 443 (quoting *Mulhall*, 287 F.3d at 552 (internal quotation marks omitted)). The Sixth Circuit has inferred knowledge of protected activity in situations where the decisionmaker "took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the [decisionmaker] was aware of the plaintiff's protected activity." *Mulhall*, 287 F.3d at 552-53.  Further, a decisionmaker's "knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Id.* at 553.  "A reasonable jury could make this inference when the plaintiff produces evidence that such prior interactions

22

make it 'highly improbable' that the individual who knew of the plaintiff's protected activity did not share this information with the second individual who actually took the adverse employment action as soon as the first individual obtained the information." *Garrett v. Mercedes-Benz Fin. Servs. USA LLC*, 331 F. Supp. 3d 699, 715 (E.D. Mich. 2018) (citing *Mulhall*, 287 F.3d at 553 (citation omitted)).

Here, Dulaney has failed to present evidence of interactions that would make it highly probable that Yadav and Chaturvedi—the decisionmakers—were informed of Dulaney's protected activity prior to her termination. *Id.* There are no reliable facts to create such an inference, and Sargeant testified that he did not recall ever reporting to Chaturvedi any allegations of race, sex, or national-origin discrimination. (D.N. 31-1, PageID # 1490) Moreover, although Dulaney met with Salmon, Chaturvedi, and Phillips prior to being terminated, she likewise does not recall whether she ever mentioned sex, race, or nationality during these meetings.[4] (*See* D.N. 23-7, PageID # 715, 717; D.N. 23-3, PageID # 1332) While Dulaney attempted to meet her obligation under this element by pointing to the fact that she complied with company policy (D.N. 31, PageID # 1466), this is insufficient. The company's self-serving policy was limited, and demonstration of compliance with that policy is not enough to show that Dulaney's complaints were necessarily brought to Yadav or Chaturvedi. *See Barrow v. City of Cleveland*, 773 F. App'x 254, 269 (6th Cir. 2019) (explaining that the Sixth Court "do[es] not allow the assumption  that once one employee has knowledge of the protected activity, it is automatically transferred to other employees because they work for the same entity"); *Williams v. Quicken Loans Inc.*, No. 4:16-CV-11496, 2017 U.S. Dist. LEXIS 215374, at *19 (E.D. Mich. Dec. 15, 2017) (finding that the

---

[4] As Dulaney does not recall whether she protested discriminatory employment practices or brought attention to discriminatory activities at these meetings, they did not give rise to any protected activity. *See Laster*, 746 F.3d at 730; *Simmons*, 2008 U.S. Dist. LEXIS 32587, at *13.

plaintiff's "unsupported assertions that [the decisionmakers'] knowledge must be inferred from knowledge possessed by others . . . is not a permissible inference as to the element of knowledge that is required to establish a retaliation claim").

Similarly, although Sargeant testified that he passed Dulaney's complaints up to the CEO, there is no evidence in the record indicating that the CEO and the defendants had the kind of "prior interactions" that would make it "highly improbable" that the CEO did not pass this information on to Yadav or Chaturvedi before he left the company.  *Garrett*, 331 F. Supp. 3d at 715.  There is likewise no evidence of any interactions between Salmon and Sargeant beyond Dulaney's testimony that Sargeant advised her to speak with Salmon and Phillips.  (*See* D.N. 23-7, PageID # 718)  Although Sargeant recalls speaking to Phillips about women and the treatment they received, Sargeant testified that he does not believe he specifically reported anything to do with sex, race, or national-origin discrimination to Phillips.  (D.N. 31-1, PageID # 1490, 1492)  Accordingly, there is insufficient evidence of "prior interactions" to create an inference that Salmon or Phillips knew of Dulaney's protected complaints to Sargeant, or that they would have brought such information to Yadav or Chaturvedi.  *Garrett*, 331 F. Supp. 3d at 715.  Moreover, Chaturvedi maintains that Phillips never had a conversation with him regarding Dulaney's complaints (D.N. 22-5, PageID # 290), and there is no evidence in the record to the contrary.

Finally, there is no evidence in the record that Defendants took an action from which it could be inferred that they were aware of Dulaney's protected activity.  While Dulaney asserts that Yadav "nit-picked" her work, Dulaney believed that Yadav was nit-picking her work due to her gender and nationality rather than in retaliation for her protected activity.  (D.N. 23-3, PageID # 1223-24 ("It was my belief that . . . [that Yadav] was nitpicking the reports because I was female . . . . [a]nd American."))  Accordingly, the Court finds that Dulaney has not presented

sufficient evidence to create a genuine issue of material fact as to whether Defendants knew of her

protected activity. *Mulhall*, 287 F.3d at 552. Thus, Dulaney is unable to establish a prima facie

case of retaliation, and summary judgment is appropriate. *See Celotex*, 477 U.S. 317 (finding that

the plain language of Rule 56 mandates entry of summary judgment "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case").

**B.     Individual Liability**

Defendants argue that Chaturvedi and Yadav cannot be held individually liable for

discrimination under the KCRA. (D.N. 22-1, PageID # 70) The KCRA makes it unlawful for an

employer "[t]o fail or refuse to hire, or to discharge any individual . . . because of the individual's

race, color, religion, national origin, [or] sex." Ky. Rev. Stat. § 344.040(1)(a). It defines an

"employer" as a "person who has eight (8) or more employees within the state in each of twenty

(20) or more calendar weeks in the current or preceding calendar year . . . and any agent of such

person." Ky. Rev. Stat. § 344.030(2). "[A]n individual employee/supervisor, who does not

otherwise qualify as an 'employer,' may not be held personally liable under Title VII. Because

KRS Chapter 344 mirrors Title VII, [this] holding [is] equally applicable to KRS Chapter 344."

*Wathen v. GE*, 115 F.3d 400, 404 (6th Cir. 1997).

Plaintiffs argue that Flex Films is vicariously liable for the individual defendants' alleged

discriminatory acts. (D.N. 31, PageID # 1462) This argument is unavailing, however, because

"while the Supreme Court found that Congress's purpose in including 'agent' in the definition of

'employer' was to define the scope of liability of the employer, it said nothing about liability on

the part of the employee/agent." *Wathen*, 115 F.3d at 406 (citing *Meritor v. Sav. Bank v. Vinson*,

477 U.S. 57, 72 (1986)). Thus, "KCRA claims do not permit liability of individuals because they

would not be considered 'employers' as defined by the [KCRA or Title VII]." *Banks v. Bosch*

*Rexroth Corp.*, No. 5:12-345-DCR, 2014 U.S. Dist. LEXIS 28043, at *7 (E.D. Ky. Mar. 5, 2014) (citing *Wathen*, 115 F.3d at 404-05).[5]   Accordingly, Yadav and Chaturvedi cannot be held individually liable under the KCRA.

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Defendants' motions for summary judgment (D.N. 22; D.N. 23) are **GRANTED**.  A separate judgment will be entered this date.

---

[5] The Sixth Circuit and the Supreme Court of Kentucky have limited this general rule, finding that while KCRA claims cannot typically be asserted against individuals, an individual *can* be liable for retaliation. *See Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 793-94 (6th Cir. 1997); *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 808 (Ky. 2004).   Because Dulaney's retaliation claim fails, however, this issue is moot.